Case No. 23-60075

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

JOHNS MANVILLE CORPORATION,
Petitioner/Cross-Respondent

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent/Cross-Petitioner

_____

ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR
ENFORCEMENT OF THE DECISION AND ORDER OF THE
NATIONAL LABOR RELATIONS BOARD, BOARD CASE NO. 08-CA-270764

_____

## REPLY BRIEF FOR PETITIONER/CROSS-RESPONDENT JOHNS
## MANVILLE CORPORATION

_____

SCOTT MCLAUGHLIN
Ogletree, Deakins, Nash,
   Smoak & Stewart, P.C.
One Allen Center, 500 Dallas Street
Suite 3000
Houston, TX 77002
713-655-5761

DARLENE HAAS AWADA
Ogletree, Deakins, Nash,
   Smoak & Stewart, P.C.
34977 Woodward Avenue
Suite 300
Birmingham, MI 48009
248-723-6128

*Attorneys for Petitioner/Cross-Respondent*

# CERTIFICATE OF INTERESTED PERSONS AND ENTITIES

Case No. 23-60075
*Johns Manville Corporation v. National Labor Relations Board*

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Johns Manville, Petitioner/Cross-Respondent

All worldwide subsidiaries and affiliates of Johns Manville, Related entities

Scott McLaughlin, Ogletree, Deakins, Nash, Smoak & Stewart, P.C.,
 Counsel for Petitioner/Cross-Respondent

Darlene Haas Awada, Ogletree, Deakins, Nash, Smoak & Stewart, P.C.,
 Counsel for Petitioner/Cross-Respondent

Ogletree, Deakins, Nash, Smoak & Stewart, P.C. – Law Firm of Counsel to
 Appellant/Cross-Respondent

National Labor Relations Board, Respondent/Cross-Petitioner

Jennifer Abruzzo, National Labor Relations Board, Counsel for
 Respondent/Cross-Petitioner

Peter Sung Ohr, National Labor Relations Board, Counsel for
 Respondent/Cross-Petitioner

Ruth E. Burdick, National Labor Relations Board, Counsel for
 Respondent/Cross-Petitioner

David Habenstreit, National Labor Relations Board, Counsel for
 Respondent/Cross-Petitioner

Kira Dellinger Vol, National Labor Relations Board, Counsel for
    Respondent/Cross-Petitioner

Greg P. Lauro, National Labor Relations Board, Counsel for
    Respondent/Cross-Petitioner

Iva Y. Choe, National Labor Relations Board, Interested Person

Lauren McFerran – Chairman, National Labor Relations Board

Gwynn A. Wilcox – Former Member, National Labor Relations Board

David M. Prouty, Member, National Labor Relations Board

Local No. 20, International Brotherhood of Teamsters – Intervenor

John Doll, Counsel for Intervenor

Stephen R. Keeney, Counsel for Intervenor

Doll, Jansen, & Ford—Law firm of Intervenor

Johns Manville further identifies its parent corporation as Berkshire Hathaway, Inc.

A supplemental disclosure statement will be filed upon any change in the information provided by this statement.

By:    */s/ Scott McLaughlin*
       Scott McLaughlin

       Attorney of Record for
       Petitioner/Cross-Respondent

# **TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS AND ENTITIES...........................i

TABLE OF CONTENTS........................................................................ iii

TABLE OF AUTHORITIES .................................................................iv

I.   INTRODUCTION ........................................................................1

II.  ARGUMENT................................................................................4

A.  The NLRB's Assertion that the Union Requested Information
    Due to Work-Diversion Concerns and Concerns Regarding
    Shipping Product Lack Support in the Record ............................4

B.  The NLRB's Waiver Argument Has No Merit...........................10

C.  The Board Erred in Finding the Union Met its Burden to
    10Establish the Relevance of the Requested Information ..........12

    1.  Substantial Evidence Does Not Establish that the Union Had a
        Reasonable Basis for Believing Johns Manville's Use of
        Third-Party Warehouses Violated the CBA ..........................13

    2.  The Circumstances Surrounding The Information Request Did
        Not Establish The Union's Purpose For Requesting the
        Information...........................................................................18

    3.  The Union Failed to Establish that the Information it
        Requested Bears a Logical Relationship to A Legitimate
        Union Purpose.......................................................................25

III. CONCLUSION ..........................................................................25

CERTIFICATE OF SERVICE ..............................................................26

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................27

# TABLE OF AUTHORITIES

*Associated Ready Mixed Concrete*,
    318 N.L.R.B. 318 (1995) ............................................................... 15-16

*Conn. Yankee Atomic Power Co.*,
    317 N.L.R.B. 1266 (1995) ............................................................ 9, 10

*Det. Edison Co. v. N.L.R.B.,*
    440 U.S. 301 (1979) .........................................................................4

*E.I. Du Pont de Nemours & Co. v. N.L.R.B.*,
    744 F.2d 536 (6th Cir. 1984) ............................................................ 24

*F.A. Bartlett Tree Expert Co.*,
    316 N.L.R.B. 1312 (1995) ................................................................ 4

*FCA US LLC*,
    371 N.L.R.B. No. 32 ...................................................................... 24

*N.L.R.B. v. A.S. Abell Co.*,
    624 F.2d 506 (4th Cir. 1980) .............................................................12

*N.L.R.B. v. PDK Invs., L.L.C.*,
    433 F. App'x 297 (5th Cir. 2011) ...................................................... 16

*N.L.R.B. v. Temple-Eastex, Inc.*,
    579 F.2d 932 (5th Cir. 1978) ................................................... 19-20, 22

*Oncor Elec. Delivery, L.L.C. v. N.L.R.B.*,
    850 F. App'x 255 ............................................................................ 4

*Ormet Aluminum Mill Prods. Corp.*,
    335 N.L.R.B. 788 .......................................................................... 20

*S & W Motor Lines*, *Inc. v. N.L.R.B.*,
    621 F.2d 598 (4th Cir. 1980) ............................................................ 13

*Sara Lee Bakery Grp., Inc. v. N.L.R.B.*,
    514 F.3d 422 (5th Cir. 2008) ......................................... 9, 12, 13, 17, 20, 22, 25

*Selkirk Metalbestos, North America, Eljer Mfg., Inc. v. N.L.R.B.*,
    116 F.3d 782 (5th Cir. 1997) .............................................................13

iv

Petitioner/Cross-Respondent Johns Manville ("Johns Manville" or "the Company"), by and through its counsel, submits this Reply Brief in support of its Petition for Review of the National Labor Relation Board's ("the Board") Order, and in opposition to the Respondent/Cross-Petitioner National Labor Relations Board's ("NLRB" or "Respondent") Cross-Petition for enforcement of its Order.

## I.  INTRODUCTION[1]

In this case, Johns Manville petitions this Court to review the Board's Decision and Order dated January 25, 2023 (reported at 372 N.L.R.B. No. 45) ("Board's Decision"), finding that Johns Manville unlawfully failed and refused to provide necessary and relevant information requested[2] by the International Brotherhood of Teamsters, Local Union No. 20 ("Union" or "Intervenor") on or about July 31, 2020, in violation of Section 8(a)(1) and (5) of the National Labor Relations Act ("Act").

---

[1] "ROA" refers to the record on appeal, filed on March 28, 2023, and reflects the pagination applied when docketed by the Court. Please note that Respondent, in its Brief, appears to use ROA pagination inconsistent with that applied by the Court. "R. Brief" refers to Respondent/Cross-Petitioner's Brief.  "I.Br." refers to the Intervenor's Brief.  "Brief" refers to Johns Manville's Opening Brief.

[2] The Union requested 1) contracts between Global One Distribution, Maumee Assembly and Johns Manville or any of its parents, affiliates, subsidiaries or divisions for the work being performed at Global One Distribution and Maumee Assembly, and 2) copies of all correspondence, including electronic correspondence, between or among hourly or management personnel at Johns Manville, Global One Distribution and Maumee Assembly that deal with, concern or are related to the work being performed by Global One Distribution and Maumee Assembly.  (ROA.191).

Dismissal of the Complaint is appropriate as the Board's Decision is not supported by substantial evidence, nor is it consistent with well-established law. Rather, the record evidence demonstrates that the Union never explained to Johns Manville why it supposedly thought the requested Third-Party contracts and correspondence would aid in the processing of its grievance. Second, the NLRB's decision relied upon the ALJ's *post hoc* explanations, never articulated by the Union, to find that the Union established relevance.  Finally, the Board's Decision disregards basic law and reaches the erroneous conclusion that the Company's Third-Party contracts and correspondence are relevant, when the issue in dispute between the parties was whether the CBA applied to facilities outside of Waterville, Ohio, and the record is devoid of evidence that the requested information would make a demonstrable difference with respect to the grievance.

Throughout its Answering Brief, the NLRB failed to effectively address the Board's missteps.  Rather, the NLRB asserted new, *post hoc* rationales for the Union's information request, unsupported by the record and, in many instances, not relied upon or considered by the Board.  To a large extent, the NLRB's arguments— asserted for the first time on appeal—center around its reconfiguration of the Union's information request and underlying grievance as a "work diversion" concern, and an objection related only to shipping work, in an apparent effort to maneuver around the Board's unsupported findings and to attempt to distinguish the

facts at hand from applicable case law. These efforts lack record support and, thus, they fail. Moreover, they are largely inconsistent with the Board's Decision.

In addition, the NLRB failed to address many of Johns Manville's credibility arguments raised in the Company's Opening Brief, instead arguing, without basis, that they are "waived."

Further, both the NLRB and the Intervenor failed to establish that the Union held a reasonable belief based upon objective evidence that the Union had a reasonable basis for believing Johns Manville's use of third-party warehouses violated the collective bargaining agreement ("CBA"). Additionally, despite numerous new rationales offered, unsupported by the record, neither the NLRB nor Intervenor can show that the Board's Decision and substantial evidence establishes that the Union, at the time of the request for information, demonstrated that the requested information is relevant to any legitimate Union purpose, and that the requested information bears a logical relationship to that purpose. Thus, an infirmity throughout the NLRB's Brief, the Intervenor's Brief, and the Board's Decision, remains: the NLRB, Intervenor, and the Board provided the Union with numerous *post hoc* justifications for the Union's information requested, however, the Union, at the time of the request, only provided bare assertions.

## II.  ARGUMENT

### A. The NLRB's Assertion that the Union Requested Information Due to Work-Diversion Concerns and Concerns Regarding Shipping Product Lack Support in the Record

The NLRB, in its Brief, anchors the majority of its arguments on the flawed premise that the Union requested information due to concerns of "work diversion" and newly developed concerns that non-unit employees at Global One Distribution or Global Distribution Center ("GDC"), Maumee Assembly and Stamping, LLC ("Maumee Assembly") (collectively referred to as "Third-Party Warehouses") were shipping products directly to customers, rather than shipping them to Johns Manville's Kingsbury Warehouse. [3]   (R. Brief, p. 5, 6, 8, 10, 11, 12, 21, 22, 23, 27, 32, 34; Doc. 54, p. 12, 13, 15, 17, 18, 19, 28, 29, 30, 34, 39, 41).  The record simply does not support this assertion, much less rise to the level of providing substantial evidence in support of these claims.  Critically, despite the NLRB's attempts to

---

[3] Intervenor, throughout its Brief to the Court, latches onto the NLRB's newly asserted rationale that the grievance pertained to work diversion.  This contradicts the position taken by the Intervenor before the Board that it believed the information was relevant to the issues of accretion and whether the CBA should be applied to the Third-Party Warehouses.  (ROA. 297-309).  Regardless, the record is devoid of evidence that this rationale was articulated to Johns Manville at the time of the request.  Intervenor also argues the bare assertion that it needed the information "to administer or police the collective bargaining agreement."  Both this Court and the Supreme Court have noted that "[a] union's bare assertion that it needs information to process a grievance does not automatically oblige the employer to supply all the information in the manner requested." *Oncor Elec. Delivery, L.L.C. v. N.L.R.B.*, 850 F. App'x 255, 258 (quoting *Det. Edison Co. v. N.L.R.B.*, 440 U.S. 301, 314 (1979)); see also *F.A. Bartlett Tree Expert Co.*, 316 N.L.R.B. 1312, 1313 (1995).

contort the record to state otherwise, the Union never articulated these concerns at the time of the information request.

Further, while the NLRB argues additional assertions in its Answering Brief in an attempt to make a case for the Union that "[i]nformation on the type of work done at the warehouses, and the extent of Johns Manville's relationship with them are germane to whether Johns Manville was performing unit work there without using unit employees," the NLRB's assertions fail in two ways: First, the Union never asserted that it needed the requested information to assess whether Johns Manville was performing work at the Third-Party Warehouses without using unit employees, nor would it need to do so. Indeed, as the NLRB concedes (R. Brief, p. 12, Doc. 54, p. 19), the Union was aware that non-unit employees were performing the work at the Third-Party Warehouses since 2015. Although the NLRB attempts to diminish this fact by asserting that the Union's concerns "focused on shipping work (R. Brief, p. 12; Doc. 54, p. 19)," the record patently does not support this assertion, nor did the Board make or rely upon such a finding.

Contrary to the NLRB's repeated claims (R. Brief, p. 6, 11, 21, 32; Doc. 54, p. 13, 18, 28, 40), the grievance stated nothing regarding the shipping of products, nor did the Board find that the grievance protested shipping.[4]  The grievance stated:

_____

[4] To the extent the NLRB means to argue, by its newly asserted emphasis on shipping. that transport work constitutes bargaining work, nothing in the CBA, specifically, or the record as a whole supports this stance.  (ROA.114-184).

The company is using non-Teamster employees at the Maumee Assembly and Stamping plant (since July 2015) and at the Global Distribution Center in Perrysburg, OH (since June 2020) to **handle and store** Johns Manville products.

The company needs to put in trained and qualified [Johns Manville] Teamster employees at these facilities handling Johns Manville products or remove all of Johns Manville's products from these facilities and build or rent space somewhere else making [Johns Manville] Teamsters employees **handle all** [Johns Manville] products.  With both of these options, the company will follow the [Union] guidelines in the collective bargaining agreement. (Emphasis added).  (ROA.187).

The NLRB's repeated misrepresentation that the Union "made clear" that it was concerned about Johns Manville's "apparent diversion of unit shipping work **in particular**" is simply unsupported by the record.  (R. Brief, p. 10; Doc. 54, p. 17). *See also* R. Brief, p. 12, 22, 27, 32, 34; Doc. 54, p. 19, 29, 34, 39, 41).  As discussed below and in Johns Manville's Opening Brief, the Union's information request pertained to whether the workforce at the Third-Party Warehouses constituted an accretion based upon Article III, Section 4[5] of the CBA, and if the CBA, thus, should be applied to those employees.

---

[5] Article III provides:
    The Company hereby recognizes the Union as the exclusive representative of all production and maintenance employees of the employer **in Waterville, Ohio**, but excluding all office clerical employees, watchmen, plant guards, machinists, electricians, welders and related apprentices and professional employees and supervisors as defined for the purposes of collective bargaining with respect to wages, hours of work and other conditions of employment as set forth in this Agreement. It is understood and agreed that the foregoing is applicable to existing facilities, normal expansion to those facilities, and to any and all operations including the designation of any new

Further, while the Board incorrectly found that the Union believed "that [Johns Manville] was not only storing materials at the third-party warehouse but also shipping products directly from them using nonbargaining unit employees in violation of the CBA," (ROA.326), the Board's conclusion is fatally based upon *post-hoc* testimony adduced at hearing, rather than communication to Johns Manville at the time of the request. (ROA.326, ROA.47-48).

In addition, the NLRB attempts to create a revisionist distinction without a difference by unsuccessfully attempting to limit alleged "shipping" based upon the destination of the product, and without any explanation or record support as to why the shipping destination would matter for purposes of the CBA. (R. Br., p. 5, 6, 21, 22, 32, 34; Doc. 54, p. 12, 13, 28, 29, 39, 41). Indeed, the Union's grievance underlying the information request glaringly fails to carve out a distinction with respect to shipping, or to shipping the product. Accordingly, these arguments constitute additional post-hoc justifications for the requested information, unarticulated at the time of the request, which stand devoid of record support.

---

Fiber Glass Plants ***at Waterville***, Ohio, as an accretion to this Agreement and Bargaining Unit.

Article III further states that the Recognition Provision applies to "existing facilities, normal expansion to those facilities, and to any and all operations including the designation of any new Fiber Glass Plants at ***Waterville, Ohio***." (emphasis added). (ROA.120).

Indeed, the Union eventually conceded at trial that shipping occurred for the product to leave the warehouses:

> Q:    Has the company ever denied that there are Johns Manville products at those facilities?
> A:    They have not denied that there's product at that facility, but they have denied that it was being shipped from those facilities
> Q:    So they said it's just sitting there and it never leaves?
> A:    No.
> Q:    So it's shipped from those facilities, because it leaves that facility at some point, right?
> A:    At some point, correct.
> (ROA.55).

Additionally, neither the Union, nor the Board, identified how shipping to outside locations constituted materially different work than shipping back to the Kingsbury warehouse, to which the Union acquiesced in 2015. (ROA.191-217, 238-250). No dispute exists that for at least five years before the request for information, the Union knew products were "handled"[6] by Third-Party Warehouse employees, yet it was not a concern. (ROA.40, 41, 61). Indeed, Konwinski admitted that once products leave the Waterville facility, the Union has no control over where the products "end up" (ROA.59-60), and there is nothing in the collective bargaining

---

[6] Contrary to the NLRB's misleading claim (R.Brief, p. 6; Doc. 54, p. 13), the grievance did not allege that Johns Manville was *shipping* products from the GDC and Maumee Stamping Warehouses using non-unit employees. Rather, as demonstrated above, the grievance alleges that the Third-Party Warehouses were using non-Teamster employees to "handle and store" Johns Manville products. (ROA.187).

agreement that limits the Company's ability to move products to the Third-Party Warehouses. (ROA.61, 114-179). Under these circumstances, the Union's claim of "concerns," and the NLRB's attempt to carve out shipping as something distinct from other bargaining unit work when this distinction is unsupported by the record, are both disingenuous. See *Sara Lee Bakery Grp., Inc. v. N.L.R.B.*, 514 F.3d 422, 432 (5th Cir. 2008). Accord *Conn. Yankee Atomic Power Co.*, 317 N.L.R.B. 1266, 1266-67 (1995) (In finding that the Union was not entitled to the requested information, the Board found significant that, although the union was aware that employer had contracted with the third-party entity for the "last several years," the union never proposed modifications to recognition clause, complained about the arrangement or filed a grievance prior to instant dispute).

Thus, NLRB's attempt to contort the record evidence to fashion its newly asserted theory, presented for the first time on appeal, that the Union made a distinction between "shipping" work and other warehouse work is without record support. Indeed, as stated, the NLRB's contortions appear an attenuated effort to differentiate the clear record evidence that the Union knew about warehouse work, which would include shipping, performed at the Third-Party Warehouses since 2015 for purposes of attempting to unsuccessfully distinguish this case from applicable precedent. However, here, just as in *Sara Lee*, 514 F.3d at 432, the Union knew about the use of non-unit employees at the Third-Party Warehouses for years, and

failed to protest or seek their inclusion in the CBA.  See also *Conn. Yankee Atomic Power Co.*, 317 N.L.R.B. 1266, 1266-67 (1995) (In finding that the Union was not entitled to the requested information, the Board found significant that, although the union was aware that employer had contracted with the third-party entity for the "last several years," the union never proposed modifications to recognition clause, complained about the arrangement or filed a grievance prior to instant dispute).

Thus, the NLRB's apparent effort to sidestep the deficiencies in the Board's analysis by asserting new and unfounded theories for the first time on appeal that the true concerns of the Union in requesting information from Johns Manville were concerns over shipping and work-diversion, despite the lack of record support for these late-offered theories, should be wholly rejected.

### B. The NLRB's Waiver Argument Has No Merit

In its Opening Brief (Brief, p. 16-17), in demonstrating that the Board erred by finding that the Union articulated "legitimate reasons" for requesting the information, Johns Manville established that the Board wrongly adopted the ALJ's crediting of manufactured reasons that the Union simply did not express. (ROA.328).  Rather than addressing the Board's faulty credibility determinations, the NLRB feigns confusion, and asserts they are waived.  (R. Brief, p. 19, n.5; Doc. 54, p. 26).  However, Johns Manville clearly identified (Brief, p. 16-17) that the Board erred by adopting the ALJ's crediting of reasons that the Union did not

express for requesting the Third-Party Warehouse Contracts and correspondence. Specifically, Johns Manville identified the following in its Brief as errors:

- "The Board erred by adopting the ALJ's conjecture that the Union is seeking, in requesting the information, to protect its members from being denied work that might rightfully be theirs under the agreement.  (ROA.247:4-5)." (Brief, p. 16).

- "The Board erred by adopting the ALJ's speculation that the information sought would reveal the type of work Johns Manville moved to the Third-Party Warehouses and the extent of Johns Manville's relationships with the entities (ROA.247:5-7), "  (Brief, p. 16-17).

- "and that the information would be relevant in helping the Union to establish if Johns Manville "hid" its financial interest in those warehouses to hide an unlawful transfer of bargaining unit work to the Third-Party Warehouses in violation of the CBA.  (ROA.247:11-13)." (Brief, p. 17).

- "The Board erred by adopting the ALJ's postulation that "a copy of the contract and correspondence between [Johns Manville] and the warehouses... is relevant in the Union's attempt to discern whether [Johns Manville] has subcontracted bargaining unit work in violation of the CBA," when the Union did not provide this as a reason for requesting the information, the nature of

the dispute is accretion, and there is no subcontracting provision in the CBA under which to file a grievance. (ROA.248:10-13)." (Brief, p. 17).

Thus, no basis exists for the NLRB's claim of waiver. The NLRB simply failed to address these errors, potentially because the record is devoid of evidence to support the Board's determinations. Further, as this Court has held, the Board's manufacturing of a *post hoc* theory of relevance, which, here, are based upon these faulty determinations devoid of record support, violates well-established precedent. *Sara Lee Bakery Grp., Inc.*, 514 F.3d at 431, (citing *N.L.R.B. v. A.S. Abell Co.*, 624 F.2d 506, 513 n.5 (4th Cir. 1980)) (explaining that the NLRB cannot point out ways in which the information may have been relevant, when those reasons were not brought to the employer's attention contemporaneously).

These reasons relied upon by the Board are all speculative and are devoid of record support. Simply stated, the Union did not articulate these reasons for requesting the information—they were manufactured by the ALJ and adopted by the Board.

### C. The Board Erred in Finding the Union Met its Burden to Establish the Relevance of the Requested Information

The NLRB concedes (R. Brief, p. 15; Doc. 54, p. 22) that an employer's duty to provide information which, as here, is not presumptively relevant to a union's fulfillment of its representational duties is only triggered when the union articulates, *at the time of the request*, a non-conclusionary explanation of the requested

information's relevance.  *Sara Lee Bakery Grp*, supra, at 431 (citing *Selkirk Metalbestos, North America, Eljer Mfg., Inc. v. N.L.R.B.*, 116 F.3d 782, 789 (5th Cir. 1997)); *S & W Motor Lines, Inc. v. N.L.R.B.*, 621 F.2d 598, 602 (4th Cir. 1980).  As set forth more fully in Johns Manville's Opening Brief, the Union did not meet its burden here, contrary to the Board's findings and the NLRB's unsupported assertions.

### 1. Substantial Evidence Does Not Establish that the Union Had a Reasonable Basis for Believing Johns Manville's Use of Third-Party Warehouses Violated the CBA

To begin, contrary to the NLRB's argument (R.Brief, p. 11; Doc. 54, p. 18), the Union did not possess a reasonable basis based upon objective evidence for believing Johns Manville's use of the warehouses violated to CBA, and thereby did not have a legitimate purpose for requesting the information.  Indeed, the Board failed to evaluate or make a finding with respect to this claim.  (ROA.323-330).

The NLRB unconvincingly argues that the Union possessed a "reasonable basis" for believing the recognition clause would cover shipping work at the Third-Party Warehouses.   In so arguing, the NLRB relies in part on the Board's unsupported finding that that warehouse work is reserved for bargaining unit employees and that expansion of Johns Manville's facilities is covered by the CBA. (R. Brief, p. 23, Doc. 54, p. 30; ROA.328). This is simply an incorrect statement of both of the contractual language itself, and of the language's practical application.

(ROA.120). Rather, the language of the CBA expressly limits coverage of the CBA to all production and maintenance employees of the employer in Waterville, Ohio (*Id.*), and limits accretion to existing facilities, normal expansion to those facilities, and to any and all operations including the designation of any new Fiber Glass Plants *at Waterville, Ohio*. (*Id.*).

Respondent attempts to inflate the significance of the fact that Johns Manville applied the CBA to the Kingsbury warehouse in Maumee, Ohio. (R. Brief, p. 9, 23; Doc. 54, p. 16, 30). However, the record contains no evidence regarding the circumstances of the application of the CBA terms to Kingsbury, and no evidence as to its significance with respect to the CBA's recognition clause. (ROA.120). Nothing in the record demonstrates that the application of the CBA terms to Kingsbury was the result of the application of Article III, Section 4. Further, the undisputed evidence establishes, and, indeed, the NLRB implicitly concedes, that the Union had knowledge of non-unit employees performing "warehouse work" in the CBA at Third-Party Warehouses since 2015 without objection from the Union. (ROA.4, 51, 61). Thus, it is patently false that "warehouse work" was reserved for bargaining unit employees.

Importantly, the Board ignored the testimony of Union witness Paul Konwinski who testified that only growth and expansion in Waterville falls under the current collective bargaining agreement:

Q:    How do you interpret that provision [Article III, Recognition] as it relates to shipping work being performed outside of Plants 1, 7, and the Kingsbury warehouse?

A:    Any expansion or growth of Johns Manville in Waterville falls under the current collective bargaining agreement. (ROA.52).

The NLRB, without record support, opines (R.Brief, p. 24, n.9; Doc. 54, p. 31) that Kowinski's concession that "any expansion or growth of Johns Manville *in Waterville* falls under the current [CBA]" was not at odds with an interpretation that the CBA applied outside of Waterville. However, his testimony is clear and unequivocal. Indeed, the NLRB points to nothing in the record (nor could it) to support an interpretation of Kowinski's testimony that would warrant a finding that Kowinski failed to concede that "any expansion or growth of Johns Manville *in Waterville* falls under the current [CBA]." (ROA.52).

The NLRB also misguidedly argues (R. Brief, p. 22, Doc. 54, p. 29) without citation that Johns Manville held an obligation to request to review the Union's claimed "objective evidence." This assertion misstates the burden for establishing relevance. The burden of showing relevance in circumstances where the requested information is not presumptively relevant rests on the union whether or not a company requests an explanation of the relevance of the request. *Associated Ready Mixed Concrete*, 318 N.L.R.B. 318 (1995), enf'd. 108 F.3d 1182 (9th Cir. 1997)

15

(when the information sought is not presumptively relevant, the union must demonstrate the relevance of the requested information).

Moreover, Johns Manville *did* request a demonstration of the Union's objective evidence. On September 18, 2020, Johns Manville communicated to the Union its expectation that the "the Union establish[] the relevance of the information requested through objective evidence" before the Company would provide the requested information. (ROA.194). The Union ignored this request.

Intervenor misguidedly relies upon *N.L.R.B. v. PDK Invs., L.L.C.*, 433 F. App'x 297 (5th Cir. 2011), a case in which this Court found a union established a reasonable basis based upon objective evidence for believing the employer violated the contract based upon hearsay, and found that the union established a legitimate purpose. Intervenor, however, omits a critical detail: the Union in *PDK Invs.* shared with the employer the details of the objective evidence relied upon to form the union's reasonable basis. Here, the record undisputedly establishes that the Union failed to articulate to Johns Manville the objective evidence forming the Union's alleged reasonable basis.

In addition, and importantly, the record is devoid of evidence establishing that the requested information would assist the Union with determining if it is "prudent and appropriate to file and proceed with [the Union's accretion grievance]," as found by the Board. (ROA.328). Although the Union represented to Johns Manville that it

needed the requested information because it related to the "interpretation dispute" [of whether the "jurisdiction" referenced in Article III, Section 4 of the CBA was limited to Waterville, Ohio] (ROA.201-22), and "to follow up on the . . . LaBiche grievance," the requested information can provide no insight into these issues. Whether the Company's interpretation of the CBA language limiting coverage to Waterville and whether conduct at issue in the grievance was thus permitted by the CBA is, as in *Sara Lee Bakery Group*, supra, determined by the language of the CBA.

The NLRB's argument (R. Brief, p. 26; Doc. 54, p. 32), that the "logical conclusion of [John's Manville's argument that the correctness of its interpretation of the CBA language limiting coverage to Waterville and whether the failure to apply the CBA to the Third-Party warehouse employees violates the CBA is apparent from the CBA's language] is that the Union must decide whether to pursue the grievance without any information on whether Waterville shipping work was moved and who is performing the work" misses the mark. No ambiguity existed with respect to whether the Third-Party Warehouse non-unit employees were performing shipping work. The NLRB's analytical gymnastics of attempting to dissect "shipping" based upon product destination aside, the Company's use of non-employees for "warehouse work" was known to the Union since 2015. (ROA.4, 51, 61). Moreover,

as discussed below, the Union never claimed to need the requested information to ascertain or confirm this known information.

The NLRB also asserts that the Board "does not pass" on arguments about the "the merits of the union's grievance" or whether a violation of the CBA actually occurred. (R. Brief, p. 24, Doc. 54, p. 31). However, the NLRB, the Intervenor, and the Board failed to address that, under the circumstances present here, the Union did not possess a reasonable basis for believing Johns Manville's use of the warehouses violated to CBA. Indeed, the Board failed to evaluate or make a finding with respect to this claim. (ROA.323-330). And, importantly, the Union failed, at any point, to articulate to the Company *how* the requested information would assist it in assessing its grievance over conduct to which it acquiesced in 2015.

For the above reasons, the record clearly establishes that substantial evidence fails to support a finding, which the Board failed to make, that the Union had a reasonable basis based upon objective evidence for believing Johns Manville's use of the warehouses violated to CBA, and thereby established a legitimate purpose.

**2. The Circumstances Surrounding The Information Request Did Not Establish The Union's Purpose For Requesting the Information**

Acknowledging the deficiencies in the Union's request for information, the NLRB concedes that "the Union's justifications may not always have been specifically articulated," and argues now, for the first time on appeal, that circumstances make the relevance of the information "readily apparent." (R. Brief,

p. 15-16, 21, n.7; Doc. 54, p. 23, 28).    Intervenor joins in this newly argued claim.

(I. Brief, p. 6; Doc. 51-1, p. 11).  This argument should be flatly rejected.  Notably,

the Board never made such a finding based upon this rationale, nor does the record

support the NLRB's late-offered justification. As the record overwhelmingly

establishes, and the Board ignored, the dispute at issue between Johns Manville and

the Union was a jurisdictional dispute over the meaning of the language set forth in

Article III, Section 4 of the CBA, and whether the language required application of

the CBA to the employees at the Third-Party Warehouses.  There is nothing implicit

or "apparent"  connecting the CBA's jurisdictional language with contracts between

Johns Manville and the Third-Party Warehouses, or with correspondence between

or among hourly and management personnel at Johns Manville and the Third-Party

Warehouses, that "deal with, concern, or are related to work being performed" at the

Third-Party Warehouses.  (ROA.191).

Moreover, the non-bargaining unit information sought by the Union is

irrelevant to the "ultimate determination" of the issue underlying the jurisdictional

dispute and accretion grievance. See *Sara Lee Bakery*, 514 F.3d at 432 ("The issue

underlying the Union's grievance is whether backhauling violates the CBA;

information regarding the contract or contracting cost are irrelevant to that ultimate

determination."); see also *N.L.R.B. v. Temple-Eastex, Inc.*, 579 F.2d 932, 938 (5th

Cir. 1978) ("[I]f the Company had responded, therefore, its response would not have

helped the Union determine whether a non-unit member had received a unit job.").
The requested information items have no demonstrated bearing on the issues for
which the Union alleged the information was required.

Intervenor cites *Ormet Aluminum Mill Prods. Corp.*, 335 N.L.R.B. 788, for
the proposition that the relevance of the information requested by the union "should
have been readily apparent" to the company given the language in the parties'
contract concerning third-party labor and a reference in the request to a recently-
filed grievance. (I. Brief, p. 11; Doc. 55-1, p, 16). Intervenor's reliance is misplaced
and the case is easily distinguishable. First, contrary to the Intervenor's assertion
the CBA contains no language concerning third-party labor. (ROA.114-184).
Second, the Board in *Ormet Aluminum* held that many of the items requested by the
union were items which the company was obligated to provide pursuant to the
subcontracting provisions of the parties' collective bargaining agreement, as the
information items in their agreement were specifically named. *Id.*, at 789. Thus, the
fact that the parties agreed to memorialize the employer's obligation to provide the
specific items requested items established the items' relevance. No such contractual
provisions exist in the instant case.[7]

### 3.  The Union Failed to Establish that the Information it Requested Bears a Logical Relationship to A Legitimate Union Purpose.

---

[7] In addition, the CBA's Management Rights provision states: "It is agreed that the
Company retains all other management rights not listed in this section unless
otherwise specifically addressed in this Agreement." (ROA.154).

Substantial evidence fails to establish that, at the time of its request, the Union articulated a legitimate purpose, and established a logical relationship between that purpose and the requested information.  To begin, the NLRB asserts (R. Brief, p. 20, Doc. 54, p. 27) that the Union was not required to identify its contractual theory for a violation to trigger a duty for the Company to supply the requested information. Here, however, the Union *did* assert the nature of the grievance and the dispute when requesting the information— the grievance was an accretion grievance, and the issue in dispute was whether the CBA must be extended to the Third-Party Warehouses despite the fact the CBA limited coverage to Waterville. (ROA.187,197-198, 214). The Union stated that it was reading the language of Article III, Section 4 (ROA.114-179) to support an accretion to the bargaining unit, and asserted that the requested information was related "to this interpretation dispute."  (ROA.214).  The Union failed, in its correspondence or in any other manner, to communicate that its concern encompassed anything else.[8]

---

[8] In addition, as discussed above, the requested information is irrelevant to the determination of whether of the CBA is limited to Waterville, Ohio, and, thus, the sought information is not logically connected with any legitimate union purpose. See *Sara Lee Bakery Group*, supra, *N.L.R.B. v. Temple-Eastex, Inc.*, 579 F.2d 932, 938 (5th Cir. 1978) ("[I]f the Company had responded, there, its response would not have helped the Union determine whether a non-unit member had received a unit job").

The NLRB's claim that the difference between a subcontracting grievance and an accretion grievance relating to a jurisdictional dispute is a "semantic distinction," as well as factually inaccurate and legally immaterial, is a strained and unmeritorious attempt to salvage the Board's decision from its reliance on *post hoc* justifications for the information request, unsupported by the record. (R. Brief, p. 19; Doc. 54: 26). The Board throughout its Decision misconstrued the Union's grievance as a subcontracting grievance, and provided the Union with *post hoc* justifications for its information request in relation to an imaginary subcontracting grievance. It is axiomatic that to consider whether information is relevant to a grievance, the Board must grasp and consider the nature of the relied upon grievance. Indeed, the Board failed, at any time, to consider that the grievance filed pertained to the Union's assertion of accretion, as the NLRB appears to acknowledge. (R. Brief, p. 20; Doc. 54, p. 27). Thus, the Board erred in its factual findings and application of law.

In this respect, and contrary to the NLRB's misrepresentation of the record (R. Brief, p. 20; Doc. 54, p. 27), the Union's communications with Johns Manville did not "focus on the failure to use unit employees to perform work." Rather, the Union was very clear:

> The contract language in the *Shoppers Food Warehouse* case stated that "if the Company should establish a new food store, or stores . . . this agreement shall apply to such new store or stores." The language in Article III, Section 4 provides that the "foregoing," meaning the first paragraph of Section 4, "is applicable to existing facilities, the normal expansion to those facilities, and to any and all operations including the designation of any new Fiber Glass

Plants at Waterville, Ohio, as an accretion to this Agreement and Bargaining Unit."

It appears that Johns Manville is narrowly interpreting this language as some type of "jurisdiction" limitation. [The Union] is reading the language "and to any and all operations" . . . as an accretion to this Agreement and Bargaining Unit" as being more encompassing than the language in the *Shoppers Food Warehouse* case. Since there appears to be a dispute as to the interpretation of Article III, Section 4, the grievance procedure is agreed upon method [sic] to resolve this dispute under Section 84 of the collective bargaining agreement. Since the requested information is related to this interpretation dispute, the *Shoppers Food Warehouse* case as well as many other Board cases support the Unions [sic] position that the information is relevant and necessary. (ROA.214).

The Union later reiterated:

[The Union] maintains its position that the information it has requested is relevant and necessary for the processing [of] the grievance filed over the failure of the Company to apply the collective bargaining agreement to the facilities referenced above [the Third-Party Warehouses]. (ROA.211).

The record overwhelmingly establishes that the Union clearly and consistently identified the grievance as an accretion grievance and sought the application of the CBA to the Third-Party Warehouses. The NLRB and Intervenor's revisionism now in arguing that the Union's focus was on "work-diversion" stands as a futile attempt to reconcile the Board's misconstruance of the dispute as a subcontracting dispute, and is wholly devoid of merit.

Equally without merit is the NLRB's assertion that the requested information "may have helped the Union to determine which theory (and solution) better fit the situation." The NLRB"s assertion that the Union considered alleging a

subcontracting has no support in the record.  (R. Brief, p. 20-21, Doc. 54, p. 28).

This newly offered rationale for requesting the information is untethered to the actual

record evidence and constitutes yet another speculative, *post hoc* articulation of

relevance advanced by the NLRB.   Further, this late-offered rationale fails to

overcome the fatal obstacle that the Union did not articulate this as a reason for the

request, or otherwise tie the requested information to this asserted reason for the

request.   Importantly, the NLRB's assertion of this reason in departs from Board

precedent holding that the proper analysis is not whether there *could* have been a

demonstration of relevance, but whether the explanations the Union actually

proffered met its burden.  *FCA US LLC*, 371 N.L.R.B. No. 32, slip op. at p. 12

(2021).  See *E.I. Du Pont de Nemours & Co. v. N.L.R.B.,* 744 F.2d 536, 538 (6th Cir.

1984).  See also *Sara Lee Bakery Grp., Inc.*, 514 F.3d at 431.

Despite the NLRB's numerous attempts to bolster the Board's Decision by

asserting new articulations of relevance in this appeal, extraneous to the record, at

bottom, the Board erred by finding Johns Manville violated Section 8(a)(5) and (1)

by failing to provide contracts and correspondence to the Union.  The Union failed

to articulate, at the time of the request, a legitimate purpose and to establish a logical

relationship between that purpose and the requested information.

### III.  CONCLUSION

For the foregoing reasons, and for the reasons set forth in Johns Manville's Opening Brief, Johns Manville requests that this Court grant its petition for review, decline to enforce the Board's Decision and Order, dismiss the Complaint, and order any further relief to which Petitioner may be entitled.

Respectfully submitted,

By: */s/ Scott McLaughlin*
Scott McLaughlin
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Allen Center, 500 Dallas Street,
  Suite 3000
Houston, TX 77002
scott.mclaughlin@ogletree.com
Telephone: 713-655-5761
Facsimile:  713-655-0020

*/s/ Darlene Haas Awada*
Darlene Haas Awada
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
34977 Woodward Avenue, Suite 300
Birmingham, MI 48009
darlene.awada@ogletree.com
Telephone: 248-723-6128
Facsimile: 248-283-2925

Attorneys for Petitioner/Cross-Respondent

Dated: September 11, 2023

## **CERTIFICATE OF SERVICE**

I certify that on September 11, 2023, I electronically filed the foregoing document with the Clerk for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF System.  I further certify that the foregoing document was served on all parties and their counsel of record through the CM/ECF system.


By:   */s/ Scott McLaughlin*
Scott McLaughlin

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,011 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in fourteen-point Times New Roman font.

Dated this 11th day of September, 2023.

OGLETREE, DEAKINS, NASH,
SMOAK, & STEWART P.C.

*/s/ Scott McLaughlin*
Scott McLaughlin